## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NETWORK STANDARDS )
CORPORATION d/b/a NETDILIGENCE, )
 )
     Plaintiff, )
 )    Civil Action No. 20-8516
    v. )
 )
ARTHUR J. GALLAGHER & CO. and )  **DEMAND FOR JURY TRIAL**
JACKLYN HUCKE )
 )
    Defendants.

## COMPLAINT

AND NOW comes Plaintiff, Network Standards Corp. d/b/a NetDiligence ("NetDiligence"), by its undersigned counsel, and files the following Complaint against Defendants Arthur J. Gallagher & Co. ("AJG") and Jacklyn Hucke ("Hucke") (collectively the "Defendants").  In support thereof, NetDiligence states as follows:

### I.    INTRODUCTION

1.    This action arises out of the Defendants' negligent failure to procure communicable disease insurance coverage as requested by NetDiligence.

2.    As a result of the Defendants' negligent actions, NetDiligence has suffered, and will continue to suffer, substantial monetary damages.

### II.    THE PARTIES

3.    NetDiligence is a privately held cyber risk assessment and data breach services company.

4.    NetDiligence is a Pennsylvania corporation and has a principal place of business located at 920 Morris Avenue, Bryn Mawr, PA 19010.

5.      AJG is an international insurance brokerage, risk management, and consulting services firm.

6.      Upon information and belief, AJG is an Illinois corporation, and has a principal place of business located at 2850 Golf Road Rolling Meadows, IL 60008, and offices at 250 Park Avenue, 5th Floor, New York, NY 10177 and 1 Jericho Plaza - Suite 200, Jericho, NY 11753.

7.      Hucke is an adult individual and, upon information and belief, is currently employed by Lockton Companies in New York and resides at 11 Silver Spruce Way, Smithtown, NY 11787.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the parties are completely diverse.

9.      This Court has general personal jurisdiction over AJG under N.Y. C.P.L.R. § 301 because AJG carries on a continuous and systematic part of its business in New York. Alternatively, this Court has specific personal jurisdiction over AJG under N.Y. C.P.L.R. § 302 because AJG committed a tortious act within the state of New York.

10.      This Court has general personal jurisdiction over Hucke under N.Y. C.P.L.R. § 301 because Hucke is domiciled and currently works in New York.  Alternatively, this Court has specific personal jurisdiction over Hucke under N.Y. C.P.L.R. § 302 because Hucke committed a tortious act within the state of New York.

11.      Venue over this action is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

2

## STATEMENT OF FACTS

12.     AJG has been NetDiligence's insurance broker for the past 18 years.

13.     During this time, AJG has gained intimate knowledge of NetDiligence's business, operations, and their relevant insurance risks and insurance needs.

14.     At all relevant times, NetDiligence communicated to AJG that NetDiligence relies upon AJG, as its insurance broker, for its specialized expertise, advice, and guidance with respect to assessing NetDiligence's risks and procuring appropriate insurance coverage that adequately protects and insures NetDiligence's business and operations from all risks and loss and for processing and submitting insurance claims.

15.     Among its various operations, NetDiligence hosts its annual Cyber Risk Summit Conferences in Philadelphia, Santa Monica, Toronto, London, and Bermuda ("Cyber Risk Summits").

**I.      The Cyber Risk Summits**

16.     NetDiligence's Cyber Risk Summits are recognized as the leading networking event for the cyber risk industry, as every year these conferences are attended by several thousands of cyber risk insurance, legal/regulatory and security/privacy technology leaders from all over the world.

17.     The Cyber Risk Summits allow leaders in cyber risk and privacy liability to connect and learn from their experiences and insights on current and emerging concerns in the ever-changing cyber landscape.

18.     Specifically, the Cyber Risk Summits present, among other things, numerous panelists, lecturers, and keynote speakers discussing recent developments and best practices utilized in the cyber risk industry.

19.     The Cyber Risks Summits also provide private client-meeting spaces for several NetDiligence clients and conference attendees to hold their own meetings with their own clients and brokers.

20.     NetDiligence also utilizes the Cyber Risk Summits to showcase its four main products and services: eRiskHub®, QuietAudit®, Breach Plan Connect®, and Breach Coach® Cyber Portal, and to meet with clients or potential clients to secure business for the sale of their software and/or increase utilization of currently licensed software for retention and/or to move client to a higher level license.

## II.     eRiskHub

21.     NetDiligence's eRiskHub is a software as a service that provides tools and resources to help clients understand the exposures of, respond effectively to, and minimize the effects of breaches on their organizations.

22.     At all relevant times, AJG was fully aware of eRiskHub, that NetDiligence marketed eRiskHub at its Cyber Risk Summits, and that significant revenue was generated directly from marketing eRiskHub at the Cyber Risk Summits.

## III.     QuietAudit

23.     NetDiligence's QuietAudit Cyber Risk Assessments provide clients a thorough, efficient way for their organization to document its data security posture and cyber risk readiness.

24.     At all relevant times, AJG was fully aware of QuietAudit, that NetDiligence relied on the Cyber Risk Summits to market QuietAudit, and that significant revenue was generated directly from marketing QuietAudit at the Cyber Risk Summits.

IV.     **Breach Plan Connect**

25.     NetDiligence's Breach Plan Connect is NetDiligence's newer software solution that gives cyber policyholders an instant data breach crisis plan.

26.     At all relevant times, AJG was fully aware of Breach Plan Connect, that NetDiligence relied on the Cyber Risk Summits to market Breach Plan Connect, and that significant revenue was generated directly from marketing Breach Plan Connect at the Cyber Risk Summits.

V.      **Breach Coach Cyber Portal**

27.     NetDiligence's Breach Coach Cyber Portal provides clients with access to cybersecurity professionals, articles and other resources to be prepared against and respond to cybersecurity threats.

28.     At all relevant times, AJG was fully aware of Breach Coach Cyber Portal, that NetDiligence relied on the Cyber Risk Summits to market Breach Coach Cyber Portal, and that significant revenue was generated directly from marketing Breach Coach Cyber Portal at the Cyber Risk Summits.

VI.     **The Event Cancellation Policy**

29.     At all relevant times, AJG, knowing that NetDiligence relies upon AJG's special expertise, procured insurance for NetDiligence for, among other things, the annual Cyber Risk Summits.

30.     Specifically, with AJG's assistance and facilitation, NetDiligence received event cancellation insurance to cover the Cyber Risk Summits every year.

31.     At all relevant times, NetDiligence's products and services (*i.e.,* eRiskHub®, QuietAudit®, Breach Plan Connect®, and Breach Coach® Cyber Portal) and NetDiligence's

reliance on the Cyber Risk Summits to market said products and services were contemplated every time the event cancellation insurance policy was renewed.

32.     Under all prior event cancellation insurance policies, with AJG's assistance and facilitation, NetDiligence received coverage for events cancelled due to communicable or infectious diseases.

33.     Specifically, AJG's then-experienced broker recommended communicable disease coverage, and as recently as 2018, this broker made clear that NetDiligence was receiving communicable disease coverage.  A copy of the 2018 insurance policy is attached hereto as **Exhibit A.**

### VII.     NetDiligence's Renewal of its Event Cancellation Insurance Policy

34.     However, in 2019, AJG assigned NetDiligence's account to Defendant Jacklyn Hucke, an inexperienced broker who is only a few years removed from graduating college.

35.     Hucke was trained by senior brokers at AJG who were previously assigned to the NetDiligence account and were careful to check with NetDiligence about what coverages were being bound before binding coverages.  In fact, it was the senior brokers at AJG who first recommended and bound communicable disease coverage for NetDiligence before AJG transferred the NetDiligence account to the inexperienced Defendant Hucke.

36.     On December 9, 2019, Hucke notified Dave Chatfield ("Chatfield"), NetDiligence's Vice-President and Chief Operating Officer, that NetDiligence's Commercial Package Policy would be renewing soon.  A copy of the December 9, 2019 letter is attached hereto as **Exhibit B.**

37.     According to the December 9, 2019 letter, Hucke states "[w]e are not aware of any changes in your exposures to loss," but if NetDiligence wanted to make any changes to its

policy, then NetDiligence needed to identify any changes they desired to be made on the "Client Authorization to Bind Coverage" page attached to the letter. *Id.*

38.     On December 20, 2019, in response to Hucke's letter, Chatfield sent to Hucke an application to renew the event cancellation insurance for 2020, which listed the five locations for this year's Cyber Risk Summits to be covered under the event cancellation insurance policy.

39.     On December 20, 2019, Hucke emailed Chatfield and attached an Event Cancellation Insurance Proposal (the "Proposal"), a Premium Per Event spreadsheet, and a quotation for Event Cancellation coverage.  A copy of the December 20, 2019 email and its attachments is attached hereto as **Exhibit C.**

40.     The Proposal lists the limit of indemnity for each event to be covered under the event cancellation policy.  The "Premium Summary" lists the proposed premiums under the four available coverage options, and the "Premium Summary" notes, much like the prior year, that "Communicable Disease" can be added to any of the coverage options for $597.40.  *See* **Exhibit C.**

41.     According to the Proposal, "Communicable Disease" coverage "[i]nsures against an order that prohibits access to the venue or movement, whether quarantine or otherwise." *Id.*

42.     In her December 20, 2019 email, Hucke notes, among other things, that "[t]he carrier quoted Communicable Disease coverage for an additional premium of $597.40.  Please advise if you wish to obtain this coverage[.]"  *Id.*

43.     Chatfield reviewed the Proposal the same day, and notified Hucke that the underwriter and managing general agent, Buttine Underwriter's Agency LLC ("BUA"), significantly miscalculated the limit of indemnity and premiums for one of the events on the

Proposal—a roughly $340,000 mistake caught by Chatfield.  A copy of Chatfield's December 20, 2019 email is attached hereto as **Exhibit D.**

44.     After Chatfield notified Hucke of this mistake, Hucke left for an extended vacation and Chatfield did not hear from her again until he sent her a reminder email on January 2, 2020 requesting the corrected premium numbers once again.

45.     Following her two week vacation delay, Hucke, no longer closely supervised by a senior AJG broker, finally responded to Chatfield's email, and provided him a revised Proposal and Premium Per Event Page (both dated December 27, 2019) with the corrected limits of indemnity and premiums.  A copy of the email and its attachments are attached hereto as **Exhibit E.**

46.     Hucke responded in her January 2, 2020 email that "**all terms and conditions remained the same**. . . ."  *See* **Exhibit E.**

47.     However Hucke, in the communication exchange, mistakenly and confusingly cited to the Premium Per Event Page, instead of a usual standard AJG audit cover letter.

48.     The important standard AJG audit cover letter, omitted by Hucke in this communication exchange, would have avoided Hucke's error involving the communicable disease coverage for NetDiligence.  The only item Defendant Hucke needed to clarify, had she acted consistent with AJG past practices for this NetDiligence account, should have been the selection of terrorism coverage needed from the three available choices.  As a result, the Hucke January 2, 2020 email was incomplete as it failed to include the standard AJG audit cover letter as had always been done in the past.  Such omission has led to event cancellation damages that should have been covered but were not.

49.     Hucke's email also attached a form titled "Client Authorization to Bind Coverage" (the "Authorization Form").  This form provided three "Option Description[s]," which included one option to "Bind All Policies As Shown Herein Except As Listed Below[.]" *See* **Exhibit E.**

50.     Hucke's incomplete January 2nd email, in lieu of the standard AJG audit cover letter, indicated to NetDiligence that Hucke was correctly binding communicable disease coverage for NetDiligence, when in fact she was not.  *Id.*

51.     Hucke's January 2nd email instructed Chatfield to only select one of the three terrorism coverage options and to confirm he was required to sign and select the option "Bind All Policies As Shown Herein Except As Listed Below" on the Authorization Form.  *Id.*

52.     However, since Hucke mistakenly and confusingly cited to the Premium Per Event Page, instead of a usual standard AJG audit cover letter, Chatfield was put in a bad position of having to decipher what premium applied to which policy, and put in the impossible position of having to figure out what policy was being referenced "Herein" under the Authorization Form.

53.     Since the requisite standard AJG audit cover letter was omitted by Hucke, and instead replaced with the Premium Per Event document with communicable disease listed as the coverage being bound, it confirmed to NetDiligence that all terms remained the same, *i.e.* same as last year and included the communicable disease coverage previously recommended by the prior senior broker who had trained Hucke.

54.     On January 3, 2020, believing he was simply renewing NetDiligence's event cancelation insurance policy, which included communicable disease coverage as Hucke had listed on the Premium Per Event attachment at binding, Chatfield signed the Authorization Form

9

and emailed Hucke that NetDiligence **selected "Option 4 'Full Terrorism including Threat' as our choice (same as last year)**."  A copy of the email and the signed Authorization Form attached to the email are attached hereto as **Exhibit F.**

55.    The reference to "same as last year" was to be sure there was no confusion that NetDiligence was looking to bind the same coverages as last year.  Since there was a Premium Per Event attachment referenced, Chatfield had the assurance Hucke was binding a policy with communicable disease coverage.

56.    Significantly, that same day, Hucke emailed Rej Audet ("Audet"), President of BUA, that NetDiligence "wishe[d] to purchase Option 4 – TRIA."  A copy of the email is attached hereto as **Exhibit G.**

57.    Shortly thereafter, Audet, apparently surprised to see communicable disease coverage missing, asked Hucke for clarification on whether communicable disease was to be included or excluded, and also for a signed TRIA form accepting coverage.  *See* **Exhibit G.**

58.    Hucke, having been away for two weeks on vacation and without seeking approval or confirmation from Chatfield or anyone at NetDiligence, simply replied quickly, without checking with NetDiligence, that "[t]hey [NetDiligence] are excluding Communicable Disease."  *See* **Exhibit G**.  Here, Hucke made zero effort to check with a major client something Audet flagged as calling for confirmation.

59.    That same day, the inexperienced Hucke, just back from her prolonged vacation, emailed Chatfield and just asked him to sign the TRIA form accepting coverage, never confirming approval from Chatfield, as she was trained to do by the former brokers on the NetDiligence account, as to whether NetDiligence was excluding communicable disease coverage.  A copy of the email and its attachment are attached hereto as **Exhibit H.**

60.     A simple follow-up communication, as Audet requested, could have cured Hucke's prior missteps that led to binding the wrong policy coverages for NetDiligence.

61.     On January 10, 2020, Hucke sent to NetDiligence "the binder [declaration page] and invoice as evidence that Event Cancellation coverage is in effect. . . .  The policy is being checked and will be sent to you once were [*sic*] finishing reviewing accuracy."  A copy of the January 10, 2020 email and its attachments are attached hereto as **Exhibit I.**

62.     NetDiligence never received a copy of the full event cancellation insurance policy (the "Policy") from Hucke until many months later on March 11, 2020, well after NetDiligence paid the invoice and well after the first event covered under the Policy took place on February 20, 2020.  This delay in sending the Policy timely prevented NetDiligence from discovering Hucke's error.  A copy of the applicable Policy, dated January 7, 2020, is attached hereto as **Exhibit J.**

63.     By this time, AJG had failed to timely deliver the Policy, had used a different convoluted email structure to communicate coverages with its client NetDiligence, had used a new and inexperienced broker, poorly communicated different underwriting methods than in prior years, had erred on premium calculations and changed the process used in prior years from a formal process to an inaccurate sloppy process replete with errors and omissions.

64.     Had a clear menu option been delivered by AJG to NetDiligence listing the proper values and schedules per event, Hucke would not have had to guess when she mistakenly and unilaterally confirmed coverage to BUA.

65.     AJG created confusion for its broker and for its client NetDiligence by ignoring the need to document accurate pricing, by utilizing different confusing forms to bind coverage and by not following up with the client when clearly asked to do so by BUA.  It defies logic that

an inexperienced broker would unilaterally cancel communicable disease coverage without having any discussion with a longtime client such as NetDiligence on why a previously AJG recommended coverage was being cancelled, all while NetDiligence was growing revenue for each event and, as a result, increasing its overall premium.

### VIII.   The Spread of COVID-19

66.     In December 2019, coronavirus disease 2019 (COVID-19), an infectious disease, was first identified in Wuhan, China.

67.     COVID-19 spread across the globe at an alarming rate, and on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic.

68.     On March 20, 2020, due to the spread of COVID-19, Bermuda issued a travel ban restricting access to Bermuda.[1]

69.     On April 1, 2020, due to the spread of COVID-19, Bermuda declared a state of emergency.[2]

70.     NetDiligence's next Cyber Risk Summit was scheduled to take place on April 22, 2020 in Bermuda.

71.     However, as a result of Bermuda's travel ban and state of emergency, NetDiligence was forced to cancel the Bermuda event.

---

[1] *See* http://www.bermudalaws.bm/laws/Annual%20Laws/2020/Statutory%20Instruments/Quarantine%20(Travel%20Ban)%20(No.%202)%20Order%202020.pdf

[2] *See* https://www.gov.bm/sites/default/files/egazette_documents/SKM_C45820040117120.pdf

72.     On March 6, 2020, due to the spread of COVID-19, Pennsylvania proclaimed the existence of a disaster emergency,[3] and on April 1, 2020, Pennsylvania issued a state-wide stay-at-home order.[4]

73.     NetDiligence's Philadelphia Cyber Risk Submit was scheduled to take place on June 3-5, 2020.

74.     However, as a result of Pennsylvania's proclaimed existence of a disaster emergency and state-wide stay-at-home order, NetDiligence was forced to cancel the Philadelphia event.

75.     On March 4, 2020, due to the spread of COVID-19, California declared a state of emergency,[5] and on March 19, 2020, California issued a stay-at-home order.[6]

76.     NetDiligence's Santa Monica Cyber Risk Submit was scheduled to take place on October 5-7, 2020.

77.     However, as a result of California's declaration of a state of emergency and stay-at-home order, NetDiligence was forced to cancel the Santa Monica event.

78.     On or around March 16, 2020, the European Commission adopted a communication recommending a temporary restriction of all non-essential travel from third countries into the European Union, and the United States remains restricted from traveling to the European Union.[7]

---

[3] *See* https://www.governor.pa.gov/wp-content/uploads/2020/03/20200306-COVID19-Digital-Proclamation.pdf
[4] *See* https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf
[5] *See* https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/
[6] *See* https://www.gov.ca.gov/2020/03/19/governor-gavin-newsom-issues-stay-at-home-order/
[7] *See h*ttps://data.consilium.europa.eu/doc/document/ST-9208-2020-INIT/en/pdf

79.     On or around March 23, 2020, due to the spread of COVID-19, the United Kingdom's Prime Minister announced nationwide lockdown measures to help stop the spread of COVID-19.[8]

80.     NetDiligence's London Cyber Risk Summit was scheduled to take place on December 2-3, 2020.

81.     However, as a result of the nationwide lockdown and indefinite travel restrictions, NetDiligence was forced to cancel the London event.

82.     NetDiligence, believing they had obtained communicable disease coverage, only learned for the first time that they did not have the coverage they requested, same as last year, when they belatedly received the Policy on March 11th.

83.     Nonetheless, NetDiligence attempted to work with AJG in resolving the NetDiligence claim due to the professional failures of Hucke but without any success and ultimately notified the carrier, Lloyd's of London ("Lloyd's"), of the claim for coverage.

84.     On June 19, 2020 Lloyd's denied coverage, asserting that communicable disease was not included in NetDiligence's coverage.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (All Defendants)

85.     The averments of the preceding paragraphs are incorporated herein as if fully set forth.

---

[8] *See* https://www.gov.uk/government/speeches/pm-address-to-the-nation-on-coronavirus-23-march-2020

86.     As noted above, AJG has been NetDiligence's long-standing insurance broker for the past 18 years.

87.     During that time, AJG gained intimate knowledge of NetDiligence's business, operations, and insurance needs and risks.

88.     At all relevant times, AJG was responsible for obtaining comprehensive risk insurance for NetDiligence's needs.

89.     At all relevant times, AJG held itself out to NetDiligence as having a specialized expertise in assessing its clients' insurance needs and risk and obtaining the proper and adequate insurance to fully cover those risks.

90.     At all relevant times, the Defendants represented to NetDiligence that it was fully covered under the Policy for all risks, which included communicable disease coverage.

91.     Based upon the Defendants' advice and counsel concerning the Policy, which the Defendants procured for NetDiligence to cover NetDiligence's risks, NetDiligence obtained the Policy from BUA, underwriters Lloyd's of London.

92.     The Defendants owed NetDiligence a duty of care to obtain proper insurance for NetDiligence that adequately covered it from risk of event cancellation due to communicable disease, including cancellations related to COVID-19 and any and all losses involved in the cancellation.

93.     The Defendants failed to obtain the communicable disease coverage as requested by NetDiligence and like they had is all the prior years of AJG's service.

94.     The lack of coverage is the direct and proximate result of the Defendants' negligent actions and/or omissions in failing to follow AJG's training, and to procure proper and

adequate insurance to cover NetDiligence's risk and insurance needs, including as set forth above.

95.    Any and all loss to NetDiligence as a result of the lack of insurance coverage and/or inadequate insurance coverage is the direct and proximate result of such negligence on the part of the Defendants, thereby causing NetDiligence to be damaged in an amount to be determined at trial, including, but not limited to, the losses in profit resulting from the cancelled Cyber Risks Summits.

96.    Furthermore, losses in profit from NetDiligence's inability to market eRiskHub, QuietAudit, Breach Plan Connect, and Breach Coach Cyber Portal due to the cancelled Cyber Risk Summits are a direct and proximate result of the Defendants' failure to obtain the communicable disease coverage as requested by NetDiligence.

WHEREFORE, NetDiligence respectfully requests that judgment be entered in its favor and against the Defendants for damages in excess of $75,000.00, together with pre-judgment interest and such other and further relief that this Court deems appropriate.

## COUNT II
### Negligent Misrepresentation
### (All Defendants)

97.    The averments of the preceding paragraphs are incorporated herein as if fully set forth.

98.    The Defendants represented to NetDiligence that NetDiligence was receiving event cancellation insurance policy with "all terms and conditions remain[ing] the same" as the previous year, which included communicable disease coverage.

99.    Furthermore, when Audet asked Hucke for clarification on whether communicable disease was to be included or excluded from the Policy, Hucke simply replied,

without checking with NetDiligence, that "[t]hey [NetDiligence] are excluding Communicable Disease."

100.    This representation, to both NetDiligence and Audet, was false and inaccurate.

101.    The Defendants had a duty to procure the insurance coverage as requested by, and represented to, NetDiligence.

102.    The Defendants did not use due care in representing this information to NetDiligence.

103.    NetDiligence relied on this representation justifiably.

104.    As a result of its reliance upon this false representation, NetDiligence suffered damages.

105.    Any and all loss to NetDiligence as a result of the lack of insurance coverage and/or inadequate insurance coverage is the direct and proximate result of such negligent misrepresentation on the part of the Defendants, thereby causing NetDiligence to be damaged in an amount to be determined at trial, including, but not limited to, the losses in profit resulting from the cancelled Cyber Risks Summits.

106.    Furthermore, losses in profit from NetDiligence's inability to market eRiskHub, QuietAudit, Breach Plan Connect, and Breach Coach Cyber Portal due to the cancelled Cyber Risk Summits are a direct and proximate result of the Defendants' failure to obtain the communicable disease coverage as requested by NetDiligence.

WHEREFORE, NetDiligence respectfully requests that judgment be entered in its favor and against the Defendants for damages in excess of $75,000.00, together with pre-judgment interest and such other and further relief that this Court deems appropriate.

<u>**COUNT III**</u>
**Breach of Fiduciary Duty**
**(All Defendants)**

107.     The averments of the preceding paragraphs are incorporated herein as if fully set forth.

108.     As noted above, AJG has been NetDiligence's long-standing insurance broker for the past 18 years.

109.     Based upon their representations, their expertise, and their long-standing relationship with NetDiligence, the Defendants owed NetDiligence a fiduciary duty to act with the utmost good faith in the best interests of NetDiligence.

110.     The Defendants breached their fiduciary duties, and failed to act as reasonable and careful brokers by, among other things:

    a.   Failing to obtain communicable disease coverage as requested by NetDiligence;

    b.   Falsely representing to NetDiligence that NetDiligence had communicable disease coverage;

    c.   Failing to confirm with NetDiligence whether communicable disease coverage was included or excluded, as specifically pointed out and requested by Audet; and

    d.   Significantly delaying providing the Policy to NetDiligence before the payment of the first premium was due, in which case NetDiligence would have been able to spot the missing communicable disease coverage before being bound by the Policy.

111.     As a direct and proximate result of the Defendants' breach of their fiduciary duties, NetDiligence has suffered damages.

18

112.    Any and all loss to NetDiligence as a result of the lack of insurance coverage and/or inadequate insurance coverage is the direct and proximate result of such breach of fiduciary duties on the part of the Defendants, thereby causing NetDiligence to be damaged in an amount to be determined at trial, including, but not limited to, the losses in profit resulting from the cancelled Cyber Risks Summits.

113.    Furthermore, losses in profit from NetDiligence's inability to market eRiskHub, QuietAudit, Breach Plan Connect, and Breach Coach Cyber Portal due to the cancelled Cyber Risk Summits are a direct and proximate result of Defendants' failure to obtain the communicable disease coverage as requested by NetDiligence.

WHEREFORE, NetDiligence respectfully requests that judgment be entered in its favor and against the Defendants for damages in excess of $75,000.00, together with pre-judgment interest and such other and further relief that this Court deems appropriate.

### COUNT IV
**Negligent Supervision**
**(v. AJG)**

114.    The averments of the preceding paragraphs are incorporated herein as if fully set forth.

115.    AJG, as Hucke's employer, had a duty to supervise Hucke.

116.    AJG placed Hucke in charge of the NetDiligence account.

117.    Hucke was unfit or incompetent to perform the work she was hired to do because of her inexperience, having recently graduated from college.

118.    Hucke's unfitness and incompetence is further demonstrated by, among other things:

   a.  Hucke's failure to use the standard AJG audit cover letter;

b.  Hucke's failure to confirm with NetDiligence whether communicable disease coverage was included or excluded in the Policy, as specifically pointed out and requested by Audet; and

c.  Hucke's significant delay in providing the Policy to NetDiligence before the payment of the first premium was due, in which case NetDiligence would have been able to spot the missing communicable disease coverage before being bound by the Policy.

119.    AJG knew or should have known that Hucke was or became unfit or incompetent to execute her duties and that this unfitness or incompetence created a particular risk of harm to its clients, including NetDiligence.

120.    Hucke's unfitness and incompetence harmed NetDiligence, and AJG's negligence in supervising Hucke was a substantial factor in causing NetDilgence's harm.

121.    Any and all loss to NetDiligence as a result of the lack of insurance coverage and/or inadequate insurance coverage is the direct and proximate result of such negligent supervision on the part of AJG, thereby causing NetDiligence to be damaged in an amount to be determined at trial, including, but not limited to, the losses in profit resulting from the cancelled Cyber Risks Summits.

122.    Furthermore, losses in profit from NetDiligence's inability to market eRiskHub, QuietAudit, Breach Plan Connect, and Breach Coach Cyber Portal due to the cancelled Cyber Risk Summits are a direct and proximate result of AJG's negligent supervision of Hucke.

WHEREFORE, NetDiligence respectfully requests that judgment be entered in its favor and against the Defendants for damages in excess of $75,000.00, together with pre-judgment interest and such other and further relief that this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, NetDiligence respectfully requests:

1.     Monetary damages in excess of $75,000.00;

2.     Pre-judgment interest; and

3.     Any and all other relief to which NetDiligence is entitled.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), NetDiligence demands a trial by jury on all the issues

so triable.

Dated:  October 13, 2020     */s/ H. Marc Tepper*
            H. Marc Tepper (NY Bar No. 652656)
            BUCHANAN INGERSOLL & ROONEY PC
            Two Liberty Place
            50 S. 16th St., Suite 3200
            Philadelphia, PA 19102
            Telephone:  215.665.8700
            Facsimile:   215.665.8760
            marc.tepper@bipc.com

            Kyle Black (admission *pro hac vice* pending)
            BUCHANAN INGERSOLL & ROONEY PC
            501 Grant Street, Suite 200
            Pittsburgh, PA 15219
            Telephone:  412.562.8800
            Facsimile:  412.562.1041
            kyle.black@bipc.com

            *Attorneys for Plaintiff Network Standards*
            *Corporation d/b/a NetDiligence*